**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

BILLY G. COLUMBEL,

                                    Plaintiff,                    6:16-CV-773
                                                                 (CFH)
v.

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.
_____

APPEARANCES:                                    OF COUNSEL:

OFFICE OF PETER M. HOBAICA, LLC                 B. BROOKS BENSON, ESQ.
2045 Genesee Street
Utica, New York 13501
Counsel for Plaintiff

U.S. SOCIAL SECURITY ADMIN.                     EMILY M. FISHMAN, ESQ.
OFFICE OF REG'L GEN. COUNSEL – REGION II
26 Federal Plaza, Room 3904
New York, New York 10278
Counsel for Defendant

**CHRISTIAN F. HUMMEL**
**United States Magistrate Judge**

## MEMORANDUM-DECISION AND ORDER

Currently before the Court, in this Social Security action filed by Billy G. Columbel ("Plaintiff") against the Commissioner of Social Security ("Defendant" or "the Commissioner") pursuant to 42 U.S.C. § 405(g), are Plaintiff's motion for judgment on the pleadings and Defendant's cross-motion for judgment on the pleadings. (Dkt. Nos. 11, 12.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is denied, and Defendant's motion for judgment on the pleadings is granted.

# I.    RELEVANT BACKGROUND

## A.    Factual Background

Plaintiff was born in 1958, making him 42 years old at the alleged onset date and date last insured.  (T. at 126).[1]  Plaintiff reported obtaining his GED in 1976.  The ALJ found he has past relevant work as a taxi driver and refrigeration mechanic helper.  Generally, Plaintiff alleges disability consisting of a stroke with partial paralysis of his left side as well as pain in his back and arm.  (*Id.* at 60).

## B.    Procedural History

Plaintiff applied for Disability Insurance Benefits on August 16, 2013.  Plaintiff's application was initially denied on October 17, 2013, after which he timely requested a hearing before an Administrative Law Judge ("ALJ").  (T. at 64-66, 70).  Plaintiff appeared at a video hearing before ALJ Roxanne Fuller on July 14, 2014.  (*Id.* at 27-58).  On November 7, 2014, the ALJ issued a written decision finding Plaintiff not disabled under the Social Security Act.  (*Id.* at 12-23.)  On April 26, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 1-3.)

## C.    The ALJ's Decision

Applying the five-step sequential evaluation, the ALJ found that Plaintiff was insured for benefits under Title II of the Social Security Act until December 31, 2000.  (T.

---

[1] The Administrative Transcript is found at Dkt. No. 8.  Citations to the Administrative Transcript will be referenced as "T." and the Bates-stamped page numbers as set forth therein will be used rather than the page numbers assigned by the Court's CM/ECF electronic filing system.

14.)  The ALJ found that Plaintiff did not engage in substantial gainful activity during the period between the alleged onset date of March 21, 2000, and the date last insured. (*Id.*)  At step two, the ALJ concluded that Plaintiff's status-post cerebrovascular accident ("CVA"), dysthymic disorder, and substance abuse were severe impairments.  (*Id.*) At step three, the ALJ determined that Plaintiff's severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings").  (*Id.* at 14-15.)  More specifically, the ALJ considered Listings 4.00 (cardiovascular system), 12.04 (mood disorders), and 12.09 (substance addiction disorders).  (*Id.*)  Before reaching step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform

> sedentary work as defined in 20 CFR 404.1567(a) with the following restrictions: occasional climb ramps or stairs; occasional climb ladders, ropes, and scaffolds; frequent reaching and overhead reaching with the left dominant arm; frequent handling objects, that is gross manipulation with the left dominant hand; frequent fingering objects, that is fine manipulation with the left dominant hand; occasional exposure to moving mechanical parts; occasional operating a motor vehicle; occasional exposure to unprotected heights; able to perform simple, routine, repetitive tasks.

(*Id.* at 16.)  At step four, the ALJ found that the above RFC prevented Plaintiff from performing any of his past relevant work, and that ALJ found that Plaintiff remained able to perform a significant number of jobs in the national economy, including document preparer, final assembler of optical goods, and addresser.  (*Id.* at 21-22.)   Thus, the ALJ concluded that plaintiff was not under a disability at the relevant time period.

## D.    Arguments

Generally, Plaintiff asserts six arguments in support of his motion for judgment on the pleadings.  First, Plaintiff argues that the ALJ failed to consider the opinion from Plaintiff's treating physician indicating he met Listing 11.04 and failed to appropriately consider Listing 11.04 at all when assessing whether the effects of Plaintiff's CVA were medically disabling.  (Dkt. No. 11, at 14-17 [Pl. Mem. of Law].)  Plaintiff argues that it is impossible for this Court to determine whether the ALJ's adverse Listing of Impairments finding is supported by substantial evidence based on the ALJ's lack of clear explanation.  (*Id.* at 15).

Second, Plaintiff argues that the ALJ failed to afford controlling weight to the treating physician's opinion or to provide good reasons for failing to adopt the less-than-sedentary restrictions contained in that opinion.  (Dkt. No. 11, at 17-19 [Pl. Mem. of Law].)  Plaintiff argues that, in weighing the treating physician's opinion, the ALJ improperly ignored evidence contrary to her conclusion.  (*Id.* at 18-19)  Plaintiff additionally argues that the ALJ erred in finding that Plaintiff's severe mental impairment was dysthymic disorder, rather than depression.  (*Id.* at 19-20).  In addition, he argues that the ALJ erred in failing to re-contact Dr. Reddy to obtain an opinion regarding Plaintiff's mental functioning.  (*Id.*)

Third, Plaintiff argues that the ALJ improperly substituted her own lay opinion for that of a medical source because there was no opinion or medical evidence to support the RFC for a range of sedentary work.  (Dkt. No. 11, at 20-21 [Pl. Mem. of Law].)  Plaintiff also argues that the ALJ failed to indicate what evidence she relied on when determining that Plaintiff remained able to perform a range of sedentary work, and failed

4

to make specific functional findings, such as the amount of time Plaintiff was able to sit,

stand, and walk.  (*Id.* at 22-23)  Fourth, Plaintiff argues that the ALJ failed to provide

sufficient reasons for finding his allegations were not entirely credible.  (*Id.* at 21-22).

Fifth, Plaintiff argues that the ALJ erred in relying on the vocational expert's testimony

that Plaintiff remained able to do a significant number of other work in the national

economy because the hypothetical used to elicit that testimony did not contain all of the

limitations opined by Plaintiff's treating physician.  (Dkt. No. 11, at 23-24 [Pl. Mem. of

Law].)   Finally, Plaintiff argues that the ALJ erred in failing to address his request that

his prior applications be re-opened.  (Id. at 24-25)

    In response to Plaintiff's second argument, Defendant argues that the ALJ

properly rejected the treating physician's opinion because that physician did not treat

Plaintiff until 2010 (ten years after the date last insured) and therefore would not have

been able to render an opinion based on personal knowledge regarding Plaintiff's

functioning during the relevant period in 2000.  (Dkt. No. 12, at 5-6 [Def. Mem. of Law].)

Defendant also argues that the ALJ appropriately rejected this opinion because it was

inconsistent with the evidence of mental and physical functioning from the relevant

period, as the ALJ discussed in the decision.  (Dkt. No. 12, at 7-9 [Def. Mem. of Law].)

Defendant argues that the ALJ therefore gave good reasons for rejecting this opinion

and relying instead on the medical evidence, and that the evidence Plaintiff contends

the ALJ ignored was merely Plaintiff's subjective reports that the ALJ appropriately

found were not credible.  (Dkt. No. 12, at 9 [Def. Mem. of Law].)

    Second, in response to Plaintiff's first argument, Defendant argues that the ALJ

was correct in finding that Plaintiff did not meet any Listing despite the treating

5

physician's form indicating findings suggestive of Listing 11.04.  (Dkt. No. 12, at 11-12 [Def. Mem. of Law].)   Defendant argues also that omission of explicit discussion of Listing 11.04 does not warrant remand because the ALJ conducted a detailed discussion of the relevant medical evidence related to Plaintiff's CVA that demonstrates why Plaintiff did not meet that Listing.  (*Id.*)

Third, in response to Plaintiff's fourth argument, Defendant argues that the ALJ properly found Plaintiff's allegations not entirely credible because the ALJ discussed substantial medical evidence that was inconsistent with those allegations from the relevant period,  the limited course of treatment for his post-stroke symptoms, cancellations of mental health appointments during the relevant period, and Plaintiff's activities of daily living that were inconsistent with his alleged level of limitation. (Dkt. No. 12, at 12-14 [Def. Mem. of Law].)

Fourth, in response to Plaintiff's second argument, Defendant argues that the ALJ had no legal duty to re-contact Dr. Reddy for a mental functional assessment, noting that 20 C.F.R. § 404.1512 was amended in 2012 to make the duty to re-contact treating physicians more discretionary.  Further, defendant contends that Dr. Reddy's treatment notes failed to show any signs or symptoms which would give rise to a gap in the record that would require the ALJ to obtain an opinion prior to making the mental RFC determination.  (Dkt. No. 12, at 15-16 [Def. Mem. of Law].)

Fifth, in response to Plaintiff's third argument, Defendant argues that the ALJ was not obligated to rely on a medical source opinion when assessing the RFC, and that there was no error in her failure to explicitly discuss every exertional function in the RFC.  (Dkt. No. 12, at 16-19 [Def. Mem. of Law].)  Defendant argues that the medical

and other evidence was sufficient for the ALJ to determine that Plaintiff remained able to perform a range of sedentary work, and that the ALJ was not required to rely on the treating physician's contrary opinion because it was inconsistent with the evidence from the relevant time period.  (Dkt. No. 12, at 16-18 [Def. Mem. of Law].)

Sixth, in response to Plaintiff's fifth argument, Defendant argues that the ALJ properly relied on the vocational expert's testimony because she included in the hypotheticals all of the limitations that were supported by the evidence, and because she was not required to account for the unsupported limitations contained in the treating physician's opinion.  (Dkt. No. 12, at 19-20 [Def. Mem. of Law].)

Seventh, in response to Plaintiff's sixth argument, Defendant argues that the implicit denial of Plaintiff's request to re-open his prior application is not subject to judicial review except in cases where the ALJ constructively re-opened the case or where the claimant has been denied due process.  (Dkt. No. 12, at 20-21 [Def. Mem. of Law].)  Defendant contends that Plaintiff failed to demonstrate a denial of due process because the medical evidence does not support a finding that Plaintiff was so incapacitated following the previous decision such that he lacked the ability to exercise his right of appeal, and, thus, cannot demonstrate denial of due process.  (*Id.*)

## II.    RELEVANT LEGAL STANDARD

### A.    Standard of Review

A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  42 U.S.C. § 405(g); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's

determination will be reversed only if the correct legal standards were not applied, or it was not supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."); *accord Grey v. Heckler*, 721 F.2d 41, 46 (2d Cir. 1983), *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

"To determine on appeal whether the ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably

have reached a different result upon a *de novo* review." *Valente v. Sec'y of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

## B.    Standard to Determine Disability

The Commissioner has established a five-step evaluation process to determine whether an individual is disabled as defined by the Social Security Act.  20 C.F.R. §§ 404.1520, 416.920.  The Supreme Court has recognized the validity of this sequential evaluation process.  *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287 (1987). The five-step process is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.  Under the cases previously discussed, the claimant bears the burden of the proof as to the first four steps, while the [Commissioner] must prove the final one.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *accord McIntyre v. Colvin,* 758 F.3d 146, 150 (2d Cir. 2014).  "If at any step a finding of disability or non-disability can

be made, the SSA will not review the claim further." *Barnhart v. Thompson,* 540 U.S. 20, 24 (2003).

## III.    ANALYSIS

### A.    Treating Physician's Opinion

The Second Circuit has long recognized the 'treating physician rule' set out in 20 C.F.R. § 404.1527(c). "'[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.'" *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008)).  However, there are situations where the treating physician's opinion is not entitled to controlling weight, in which case the ALJ must "explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Id.* (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013)).  However, "[w]here an ALJ's reasoning and adherence to the Regulations is clear, she is not required to explicitly go through each and every factor of the Regulation." *Blinkovitch v. Comm'r of Soc. Sec.*, No. 3:15-CV-1196, 2017 WL 782979, at *4 (N.D.N.Y. Jan. 23, 2017), *adopted by* 2017 WL 782901 (N.D.N.Y. Feb. 28, 2017) (citing *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order)).  After considering these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's

opinion.'"  *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129).  "The failure to provide 'good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand.'"  *Id.* (quoting *Burgess*, 537 F.3d at 129-30).

Plaintiff argues that the ALJ failed to analyze the functional restrictions included in the opinion from treating physician Richard Sullivan, M.D., and failed to provide good reasons for rejecting that opinion.  However, Plaintiff's allegations are contradicted by an examination of the ALJ's decision.  The ALJ first noted that she considered Dr. Sullivan's August 12, 2014, opinion, stating the following:

> Dr. Sullivan noted that he has seen the claimant once every six months between December 24, 2010 and May 8, 2014. Based on his observations, he wrote that the claimant was unable to lift and/or carry more than five pounds in his right hand, and none at all in his left hand.  He referred to the claimant's left arm and hand as "useless."  He opined that the claimant could sit for one hour in an eight-hour day, and stand and/or walk for no more than 30 minutes of an eight-hour day. He could only walk six feet without use of a cane due to his impaired stance and gait.  He should never be exposed to unprotected heights, moving mechanical parts, humidity, wetness, pulmonary irritants, extreme heat, extreme cold and vibrations.  He would be able to walk one block at a reasonable pace.  Finally, Dr. Sullivan noted, the claimant [l]acks the mental ability to do any work due to stroke and narcotics.

(T. 20-21.)  This detailed discussion of the limitations Dr. Sullivan opined contradict Plaintiff's assertions that the ALJ failed to analyze Dr. Sullivan's opinion.  Additionally, Plaintiff's own argument recognizes that the ALJ analyzed this opinion by acknowledging that the ALJ explicitly afforded it "very little weight" and that the ALJ provided reasons for rejecting this opinion.  (Dkt. No. 11, at 18-19 [Pl. Mem. of Law].) Plaintiff's assertion that the ALJ failed to analyze Dr. Sullivan's opinion is, therefore, unpersuasive.

Plaintiff's argument that the ALJ failed to provide good reasons for rejecting Dr. Sullivan's opinion is likewise unpersuasive. As Plaintiff acknowledges, the ALJ cited to the lack of evidence of use of an assistive device during the relevant period, and examinations showing relatively normal gait, and generally unremarkable emotional and mental observations during the relevant period. (Dkt. No. 11, at 18-19 [Pl. Mem. of Law].) However, the ALJ went even further than the reasons to which Plaintiff objects, citing also to the fact that Dr. Sullivan did not begin treating Plaintiff until 2010, that his opinions appeared to be based primarily on evidence from ten or more years after the date last insured, and that his opined limitations were generally inconsistent with the evidence from treating and examining physicians during the relevant time period. (T. 21.) The decision shows that the ALJ provided multiple explanations for her rejection of Dr. Sullivan's opinion, reasons which also show that the ALJ analyzed this opinion according to the proper factors. *See Greek*, 802 F.3d at 375. As the ALJ applied the appropriate analytical framework when assessing this opinion, the question becomes whether the reasons the ALJ provided constitute "good reasons."

This Court finds that the ALJ provided good reasons. Although the Second Circuit has indicated that "medical evidence generated after an ALJ's decision cannot [be] deemed irrelevant solely because of timing," (a proposition that would logically also apply to evidence generated after the date last insured where it acts as a cut-off point for the ALJ's analysis) it is certainly a relevant factor to consider as part of the larger analysis. This is particularly true where, as here, the opinion was provided a significant time – 14 years – after the relevant period had ended and the source providing the opinion did not have a personal treating or even examining relationship with Plaintiff

until nearly ten years after the relevant period.  *See Newbury v. Astrue*, 321 F. App'x.

16, 18 n.2 (2d Cir. 2009) (summary order) (citing *Pollard v. Halter*, 377 F.3d 183, 193

(2d Cir. 2004)).  Even though Dr. Sullivan indicated that he had reviewed the relevant

evidence in the record prior to offering his opinion and that his findings applied to that

earlier period forward, lacking is a personal basis for his opinion that Plaintiff had the

opined limitations as early as September 8, 1998.  This fact essentially renders Dr.

Sullivan's opinion more comparable to that of a non-examining reviewing physician for

all purposes relating to the period at issue.  The timing of Dr. Sullivan's opinion and the

dates he treated Plaintiff were therefore particularly relevant considerations in this case.

Nor did the ALJ reject Dr. Sullivan's opinion solely based on the timing of his

treating relationship and opinion.  Rather, she provided several other reasons to support

her decision.  A review of Dr. Sullivan's opinion substantiates the ALJ's assertion that,

even though Dr. Sullivan indicates he reviewed evidence back to 1998, he appeared to

have relied primarily on evidence from well after the relevant period as the basis for his

opinion.  (T. 596-601.)  For example, Dr. Sullivan cites specifically to a brain CT from

2005, a CT of Plaintiff's back from 2005, his personal observations of Plaintiff's gait and

stance, and his personal observations related to phone calls with Plaintiff, also from

after 2010.  (*Id.*)  In his corresponding form that related to Listing 11.04 (which will be

discussed further in another section of this Decision and Order), Dr. Sullivan notes that

"my physical findings are similar to those described in his Sept. 2008 hospital notes,

except his limbs were flaccid then [and] got spastic over time which is the natural

progression."  (*Id.* at 595.)  All of these statements together seem to suggest that Dr.

Sullivan relied heavily on his own observations of Plaintiff and on evidence from multiple

years after the relevant period when formulating his opinion.  Although the ALJ could

not reject this opinion solely because it and the evidence on which it relied were from a

later time period, the ALJ was entitled to reject evidence from the later period that was

not consistent with the picture of Plaintiff's limitations present in the evidence from the

relevant period, which she did.  (*Id.* at 21.)

The evidence from the relevant period does not suggest the extent of limitations

Dr. Sullivan opined.  On January 28, 2000, Plaintiff presented for treatment after falling

while chasing his daughter, injuring his hip.  (T. 520.)  Nurse Practitioner ("NP") Elaine

Trevisani observed that Plaintiff was well-nourished and well-groomed, alert and

oriented, displayed appropriate mood and affect, had a steady gait without ataxia,[2]

grossly intact cranial nerves, normal blink and gag reflexes, normal deep tendon

reflexes, equal motor strength in the lower extremities, weaker motor strength and hand

grasp in the left upper extremity, and normal active back range of motion.  (*Id.* at 522-

23).  Plaintiff reported pain in his left hip with full squat and internal rotation.  (*Id.*)

Audiometric testing on March 6, 2000, showed that Plaintiff's hearing was normal for

speech-range frequencies with mild-to-moderate sensorineural loss in the left ear and

mild loss in the right ear.  (*Id.* at 518.)  On March 7, 2000, Plaintiff cancelled an

appointment for a psychiatric evaluation.  (*Id.*)On April 7, 2000, Plaintiff reported various

symptoms of depression, loss of concentration and focus, and inability to read since his

CVA in 1998.  (*Id.* at 515.)

---

[2]    "Ataxia describes a lack of muscle control or coordination of voluntary movements, such as
walking or picking up objects." *Ataxia*, MAYO CLINIC, http://www.mayoclinic.org/diseases-
conditions/ataxia/home/ovc-20311863 (last visited June 22, 2017).

Arunadevi Reddy, M.D., observed Plaintiff had "noticeable motor impairment" in his left arm, related well with good eye contact, had no psychomotor abnormality, reported a depressed mood with a full and appropriate affect, was not delusional, had a coherent and goal-directed thought process, had intact memory and recall, was able to perform serial sevens testing, and was able to remember and list the presidents from Clinton back to Nixon accurately. (T. 516.) Dr. Reddy assessed dysthymic disorder and discussed starting medication for his mental symptoms. (*Id.* at 517.) Plaintiff cancelled psychiatry appointments on May 8 and May 19, 2000. (*Id.* at 513.) An eye examination on July 18, 2000, revealed only presbyopia, or far-sightedness typically caused by aging. (*Id.* at 512-13.) On August 23, 2000, Plaintiff reported he stopped taking Serzone for his mood disorder due to severe side effects and was experiencing increased sensitivity to emotional issues, including tearfulness, nervousness, disturbed sleep, lack of motivation, low energy levels, and impaired concentration. (*Id.* at 511.) Dr. Reddy prescribed Celexa and Trazadone to address these reported symptoms. (*Id.*) On September 25, 2000, Plaintiff reported that he was not certain whether Celexa was improving his symptoms, but Trazadone had been helpful, though he reported he remained tearful with slight provocation; Plaintiff noted he was currently under a lot of stress because he was contesting for custody of his daughter in court. (*Id.* at 509.) On November 7, 2000, Plaintiff cancelled a psychiatry appointment. (*Id.* at 508.) On December 12, 2000, Plaintiff reported fairly regular compliance with Celexa and Trazadone and that he felt "more in control" since starting Celexa. (*Id.*) Dr. Reddy observed on this date that Plaintiff's mood was neutral, his affect was full-range and

appropriate, and his speech was fluent.  (*Id.*)  On January 24, 2001, Plaintiff cancelled another psychiatric appointment.  (*Id.* at 507.)

Much of the rest of Plaintiff's treatment in 2001 relates to his mental impairments, and indicates sporadic non-compliance and more cancelled psychiatric appointments. (T. 497, 500, 503, 505.)  An examination on February 16, 2011 showed that Plaintiff's left arm was flaccid and he reported it caused him pain.  (*Id.* at 506.)  On August 31, 2001, he reported no difficulty swallowing or eating, and NP Trevisani observed that he had grossly intact neurological functioning, normal deep tendon reflexes, "symmetrical and strong" motor strength rated at 5/5 in the bilateral upper and lower extremities, no structural abnormalities with active full range of motion in the back, negative straight leg raising, intact sensation in the left extremity, and a non-antalgic gait; NP Trevisani noted weakness in the right hand, which does not appear to be consistent with Plaintiff's CVA, which impacted his left side.  (*Id.* at 502.)

None of the above evidence from the relevant period of March 2000 through December 2000 or even the year following suggests that the significant extent of both physical and mental restrictions that Dr. Sullivan opined were present between Plaintiff's alleged onset date and his date last insured.  Thus, ALJ's finding that Dr. Sullivan's opinion was inconsistent with the evidence from the relevant period was reasonable. This finding, along with the others that the ALJ listed in the decision, constitutes sufficient good reasons for declining to adopt Dr. Sullivan's opinion.  *See Saxon v. Astrue*, 781 F. Supp. 2d 92, 102 (N.D.N.Y. 2011) ("The less consistent an opinion is with the record as a whole, the less weight it is to be given.") (citing *Stevens v. Barnhart*, 473 F. Supp. 2d 357, 362 (N.D.N.Y. 2007)); *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x

887, 889 (2d Cir. 2007) (summary order) (noting that an ALJ may reject an opinion from a treating physician "upon the identification of good reasons, such as substantial contradictory evidence in the record") (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)); 20 C.F.R. § 404.1527(c)(4) (indicating that the extent that an opinion is consistent with the record as a whole is one of the factors considered when determining the amount of weight to which an opinion is entitled). Consequently, there is no merit to Plaintiff's assertions that the ALJ failed to properly analyze Dr. Sullivan's opinion or to provide good reasons for the weight afforded to that opinion.

As such, the ALJ provided sufficient good reasons supported by substantial evidence to justify his rejection of Dr. Sullivan's opinion. Thus, remand is not warranted on this basis.

## B.    Listing 11.04

"Plaintiff has the burden of proof at step three to show that her impairments meet or medically equal a Listing." *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 272 (N.D.N.Y. 2009) (citing *Naegele v. Barnhart*, 433 F. Supp. 2d 319, 324 (W.D.N.Y. 2006)). "To meet a Listing, Plaintiff must show that her medically determinable impairment satisfies all of the specified criteria in a Listing." *Id.* (citing 20 C.F.R. § 404.1525(d)). "If a claimant's impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.* (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Additionally, a court may be able to uphold an ALJ's finding that a claimant does not meet a Listing even where the decision lacks an express rationale for that

finding if the determination is supported by substantial evidence.  *Id.* at 273 (citing *Berry*

*v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982)).

The requirements of Listing 11.04 are as follows:

> 11.04 – Central Nervous System Vascular Accident
> With one of the following more than 3 months post-vascular
> accident:
> A. Sensory or motor aphasia resulting in ineffective speech or
> communication; or
> B. Significant and persistent disorganization of motor function
> in two extremities, resulting in sustained disturbance of gross
> and dexterous movements, or gait and station (see 11.00C).[3]

20 C.F.R. § 404, Subpart P, App. 1, §11.04 (2014).

Plaintiff argues that the combination of the ALJ's failure to discuss both Listing §

11.04 specifically and the form in which Dr. Sullivan suggested that Plaintiff had

symptoms to meet the criteria of that Listing was an erroneous omission that prevents

this Court from determining whether the Step Three finding is supported by substantial

evidence.  (Dkt. No. 11, at 14-17 [Pl. Mem. of Law].)  Although Plaintiff is correct that

the ALJ did not specifically discuss Listing § 11.04 or specifically address this other form

from Dr. Sullivan and erroneously discussed Listing § 4.00, such omissions do not

automatically entitle Plaintiff to a remand.  (T. 14-16.)

In terms of the ALJ's alleged failure to discuss Dr. Sullivan's "Listing opinion," this

Court finds that the reasons the ALJ provided for affording very little weight to Dr.

Sullivan's functional opinion also reasonably apply to this additional part of Dr. Sullivan's

---

[3]        11.00C indicates that persistent disorganization of motor functioning can be "in the form of
paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances," and that
"[t]he assessment of impairment depends on the degree of interference with locomotion and/or
interference with the use of fingers, hands, and arms."  20 C.F.R. § 404, Subpart P, App. 1, §11.00C
(2014).

opinion.  As noted previously, Dr. Sullivan's whole opinion, including the form that asks

questions related to the criteria of Listing 11.04, appears to be based primarily on

evidence from well after the date last insured, a fact that weakens its probative value for

assessing Plaintiff's functioning in March to December of 2000.  Additionally, the

symptoms that Dr. Sullivan notes on this form are inconsistent with the evidence from

the relevant time period.  For example, the evidence from 2000 and 2001 detailed

previously does not reveal any objective evidence of any speech difficulties, let alone

the "severe speech impairment" that Dr. Sullivan opined.  (T. 516, 594.)  Although

Plaintiff is noted to have left-sided weakness or flaccidness of the left arm on some

occasions, other examinations showed relatively normal motor strength.  (*Id.* at 502,

506, 516, 523.)  Thus, the rationale provided for the weight the ALJ afforded to Dr.

Sullivan's functional opinion also applies to the other pages included with that opinion,

whether or not the ALJ explicitly stated as much.  *See Coleman v. Comm'r of Soc. Sec.*,

No. 5:14-CV-1139, 2015 WL 9685548, at *5 (N.D.N.Y. Dec. 11, 2015) (holding that "'an

ALJ is not required to discuss in depth every piece of evidence contained in the record,

so long as the evidence of record permits the Court to glean the rationale of an ALJ's

decision.'") (quoting *LaRock ex. rel. M.K. v. Astrue*, No. 10-CV-1019, 2011 WL

1882292, at *7 (N.D.N.Y. Apr. 29, 2011)).  Because it can be reasonably inferred that

the ALJ would have weighed or intended to weigh the Listing-specific opinion the same

way she weighed the more specific functional opinion contained in the same exhibit

based on the reasons she provided, any error in failing to explicitly discuss the Listing

opinion is at most harmless.  *See Blabac v. Comm'r of Soc. Sec.*, No. 3:08-CV-0849,

2009 WL 5167650, at *9 (N.D.N.Y. Dec. 18, 2009) (collecting cases which indicate

harmless error where the opinions that the ALJ failed to weigh either did not conflict with the ALJ's findings or written consideration of the opinions would not have changed the outcome of the ALJ's decision).

Further, although the ALJ erroneously included listing § 4.00, Cardiovascular System, rather than § 11.04 and referred to Plaintiff's "post cardiovascular accident" and receiving treatment for a "right-sided cardiovascular accident," a review of the decision in its entirely reveals that the ALJ was aware that Plaintiff suffered strokes, not cardiovascular attacks. (T. 14, 17). The ALJ directly refers to plaintiff's "history of two strokes and one endarterectomy" and that he "Alleged disability due to a stroke." (*Id.* at 15, 17). Further, the ALJ's review of Plaintiff's alleged symptoms accurately reflects the symptoms Plaintiff alleged and her review of the medical records also reflects her understanding that Plaintiff suffered strokes, rather than heart attacks. (*Id.* at 17-20). Thus, the ALJ's error, although careless and perhaps reflecting a misunderstanding of the term "cardiovascular," is untimately harmless.

Additionally, Plaintiff's arguments assume that Dr. Sullivan's notations regarding symptoms meeting the criteria of the Listing were an accurate assessment of his condition, but that is not the case given the lack of evidence supporting Dr. Sullivan's statements within the relevant period, the ALJ reasonably determined otherwise with regard to his condition in 2000. Plaintiff does not point to any evidence that shows he actually suffered from sensory or motor aphasia that caused ineffective speech or communication more than three months after his CVA, and this Court did not find any such evidence in the treatment record. Although Dr. Sullivan checked boxes indicating that Plaintiff had significant and persistent disorganization of motor functioning in his left arm and left leg that resulted in sustained disturbance of the relevant functioning of

20

those extremities, the medical evidence does not corroborate those statements.  Even if

Plaintiff could arguably show evidence of sufficiently impaired functioning in his left arm

at the relevant time period, the medical record does not show that he also experienced

Listing-level symptoms in his left leg, since the evidence from the relevant time period

shows primarily steady or non-antalgic gait, normal lower extremity motor strength, and

no suggestion of a need to use an ambulatory aid.  The ALJ was not required to accept

Dr. Sullivan's statements that Plaintiff met the criteria of the Listing at face value, but

was instead required to assess the relevant evidence as a whole, which is precisely

what she did here.

Plaintiff's argument that the ALJ's lack of explicit discussion of Listing 11.04

prevents this Court from being able to determine whether the Step Three finding is

supported by substantial evidence is also not persuasive given the significant and

detailed discussion of the evidence that the ALJ provided in the written decision.  (T. 17-

20.)  The ALJ provided a thorough consideration of the evidence particularly related to

the effects of Plaintiff's CVA from which this Court is able to glean that the ALJ did not

find symptoms severe enough to meet the criteria of Listing 11.04.  *See Barringer v.*

*Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 78 (N.D.N.Y. 2005) ("Where 'the evidence of

record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not

required to explain] why he considered articular evidence unpersuasive or insufficient to

lead him to a conclusion of disability.'") (quoting *Mongeur v. Heckler*, 722 F.2d 1033,

1040 (2d Cir. 1983)).  It is clear from the evidence in the record, including that which the

ALJ explicitly discussed in the decision, that Plaintiff did not have the requisite findings

necessary to show he met Listing 11.04.  As this Court is able to determine that the

ALJ's Step Three finding is supported by substantial evidence despite the lack of an explicit finding, remand is not appropriate. *See Rockwood*, 614 F. Supp. 2d at 273

### C.   Plaintiff's Mental Impairment and ALJ's Duty to Re-Contact Physician

This Court has recognized that "[i]n furtherance of the duty to develop the record, an ALJ may re-contact medical sources if the evidence received from the treating physician or other medical sources is inadequate to permit a reasoned disability determination and additional information is needed to resolve the question." *Crysler v. Astrue*, 563 F. Supp. 2d 418, 432 (N.D.N.Y. 2008) (citing 20 C.F.R. § 404.1512(e)). "Remand is necessary if the ALJ fails to attempt to contact the treating physician to properly determine her RFC." *Smith v. Astrue*, 896 F. Supp. 2d 163, 176 (N.D.N.Y. 2012). However, there is no obligation to re-contact a treating physician where the evidence of record is "adequate to permit the ALJ to make a disability determination." *Carvey v. Astrue*, 380 F. App'x 50, 53 (2d Cir. 2010) (summary order) (citing *Perez v. Chater*, 77 F.3d 41, 47-48 (2d Cir. 1996)); *see also* 20 C.F.R. § 404.1520b (indicating that the Commissioner may re-contact a treating physician "[i]f the evidence is consistent, but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled").

Plaintiff's argument that the ALJ erred in failing to find Plaintiff's depression to be a severe impairment rather than dysthymic disorder is unpersuasive. (Dkt. No. 11, at 19 [Pl. Mem. of Law].) Plaintiff does not explain how the characterization of Plaintiff's mood disorder in any way impacted the ALJ's analysis or consideration of the functional

effects of that disorder. Although Plaintiff argues that the characterization was important because dysthymic disorder "is not a Listing category," Plaintiff's argument ignores the fact that Listing 12.04 covers *all* mood disorders, and dysthymic disorder is a form of depression.[4] Plaintiff's argument also ignores the fact the ALJ did explicitly analyze Plaintiff's mental symptoms under Listing 12.04, as she would have been required to do even if she had characterized Plaintiff's mood disorder as depression. (*Id.* at 15-16.) Additionally, the treatment notes from Dr. Reddy during the relevant time period indicate that sources assessed Plaintiff specifically with dysthymic disorder. (*Id.* at 497, 503, 505, 508-09, 511, 517.) Plaintiff has not shown that there was any error in the ALJ's characterization of his mental impairment.

Plaintiff also argues that the ALJ was required to "contact Dr. Reddy to obtain an RFC as to his mental impairments" rather than "dismissing" his mental complaints. (Dkt. No. 11, at 19-20 [Pl. Mem. of Law].) However, given the ALJ's thorough discussion of the mental treatment evidence from the relevant period, her analysis of Listing 12.04, and her inclusion of a limitation for simple, routine, and repetitive tasks, it is clear that the ALJ did not ignore Plaintiff's mental impairments. Plaintiff essentially argues that the ALJ was not able to make a determination as to whether Plaintiff was disabled or the extent of limitations he experienced as a result of his mental impairments without the guidance of an opinion from Dr. Reddy. However, contrary to those arguments, there was sufficient evidence in the record from which the ALJ could have reasonably made those determinations. *See Janes v. Colvin*, No. 6:15-CV-1518, 2017 WL 972110,

---

[4]    *See Persistent Depressive Disorder (Dysthymia)*, MAYO CLINIC, http://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/home/ovc-20166590 (last visited July 25, 2017).

at *3 (N.D.N.Y. Mar. 10, 2017) ("the ALJ need not seek additional information from a given provider when the record contains notes from the provider that are adequate for the ALJ to determine the claimant's disability.") (citing *Merritt v. Colvin*, 142 F. Supp. 3d 266, 270 (N.D.N.Y. 2015)); *Carvey*, 380 F. App'x at 53.  Notably, the ALJ discussed the treatment notes from Dr. Reddy, which showed fairly mild mental symptoms.  For instance, on April 7, 2000, Dr. Reddy observed Plaintiff related well with good eye contact, had no psychomotor abnormality, reported a depressed mood with a full and appropriate affect, was not delusional, had a coherent and goal-directed thought process, had intact memory and recall, was able to perform serial sevens testing, and was able to remember and accurately list presidents in office from Clinton back to Nixon.  (T. 516.)  Plaintiff reported continuing symptoms on September 25, 2000, but noted he had also been under greater stress recently due to court proceedings seeking custody of his daughter.  (*Id.* at 509.)  On December 12, 2000, Dr. Reddy noted that Plaintiff reported feeling more in control since starting Celexa for his mood disorder, and the mental status examination from this date was unremarkable.  (*Id.* at 508.)  Plaintiff continued to report that his depression symptoms were controlled in 2001 until he stopped taking his medications.  (*Id.* at 497, 503, 505.)  The ALJ also noted several appointments scheduled with Dr. Reddy that Plaintiff cancelled.  (*Id.* at 18-19.)

The evidence from Dr. Reddy indicates that Plaintiff's depressive symptoms were fairly mild and improved when he was compliant with his medication.  There is nothing in the medical evidence from the relevant time period which substantiates greater mental-related limitations than the ALJ accounted for in the RFC.  Because Dr. Reddy's treatment notes provide more than sufficient evidence to allow the ALJ to determine the

issue of disability related to Plaintiff's mental functioning within the relevant time period, there was no gap in the record that would have necessitated the ALJ to re-contact Dr. Reddy for a functional opinion.  *See Janes*, 2017 WL 972110, at *3; *Carvey*, 380 F. App'x at 53.  Additionally, Plaintiff's representative requested additional time at the hearing to attempt to obtain a statement from Dr. Reddy.   The ALJ granted this request, but Plaintiff did not submit any statement from Dr. Reddy during that extension period, nor is there any indication he sought the ALJ's assistance in obtaining one.  (T. 30.) Plaintiff cannot now fault the ALJ for the absence of a statement from Dr. Reddy because his own attempts to obtain such a statement were unsuccessful for reasons he does not explain and he did not request the ALJ's assistance.

For all the above reasons, the ALJ did not commit reversible err in his analysis of Plaintiff's mental impairment or in assessing Plaintiff's mental functioning without an opinion from Dr. Reddy.  Accordingly, remand is not warranted on this basis.


### D.    RFC Determination

Residual functional capacity is defined as "'what an individual can still do despite his or her limitations . . . Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.'" *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999)).  "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis."  *Id.* (citing 20 C.F.R. § 404.1545(a)).

"Ultimately, '[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.'" *Hendrickson v. Astrue*, No. 5:11-CV-0927, 2012 WL 7784156, at *3 (N.D.N.Y. Dec. 11, 2012) (quoting SSR 85-15, 1985 WL 56857, at *8).

The Second Circuit has recognized that "[t]he ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 131). However, there is no legal requirement that the ALJ rely on a medical opinion in every case to formulate the RFC; rather, the ALJ has the responsibility of reviewing all the evidence before her, resolving inconsistencies, and making a determination consistent with the evidence as a whole. *See Bliss v. Colvin*, No. 3:13-CV-1086, 2015 WL 457643, at *7 (N.D.N.Y. Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); *Petell v. Comm'r of Soc. Sec.*, No. 7:12-CV-1596, 2014 WL 1123477, at *10 (N.D.N.Y. Mar. 21, 2014) (same); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). "[I]t is the province of the ALJ to consider and resolve conflicts in the evidence as long as the decision rests upon 'adequate findings supported by evidence having rational probative force.'" *Camarata v. Colvin*, No. 6:14-CV-0578, 2015 WL 4598811, at *9 (N.D.N.Y. July 29, 2015) (quoting *Galiotti v. Astrue*, 266 F. App'x 66, 67 (2d Cir. 2008) (summary order)).

Plaintiff argues that the ALJ's finding that Plaintiff could perform a range of sedentary work was improper because there was no medical opinion in the record that

26

indicated an ability to perform sedentary work with the additional identified limitations. (Dkt. No. 11, at 20-21 [Pl. Mem. of Law].)  However, Plaintiff's argument appears to be premised on the assumption that, because Dr. Sullivan provided the only functional opinion present in the record, the ALJ was required to accept the limitations Dr. Sullivan opined.  This is not an accurate assessment of the law related to the ALJ's duty to weigh opinion evidence and formulate the RFC.  Rather, as noted above, it is the ALJ's responsibility to formulate the RFC based on a consideration of all the evidence before her.  *See Bliss*, 2015 WL 457643, at *7; *Petell*, 2014 WL 1123477, at *10.

Contrary to Plaintiff's assertion that the ALJ "never explains" why she rejected Dr. Sullivan's opinion that Plaintiff was limited to sitting and walking one hour total in an eight-hour work day, the ALJ provided a multitude of reasons, which are supported by substantial evidence, for declining to rely on Dr. Sullivan's opinion, as already detailed above.  (T. 20-21.)  The complete lack of evidentiary support for the severe restrictions outlined in Dr. Sullivan's opinion show that the ALJ did not substitute her own lay opinion for that of a physician, but instead reasonably determined that the opinion was not supported by the evidence from the relevant time period.

Notably, Plaintiff does not make any specific arguments indicating how the ALJ's finding of sedentary work with the additional restrictions was unreasonable or contradicted by relevant evidence in the record.  The ALJ included a detailed discussion of the medical evidence from the relevant time period related to the effects of Plaintiff's CVA, and it is this discussion that shows the ALJ's analysis and the evidence she relied on when formulating the RFC.  (T. 17-20.)  Additionally, the ALJ included the following:

> Overall, based on his physical demonstrations, I find that the
> claimant was capable of sedentary work activity during the

27

> period at issue, with only occasional climbing and frequent but not constant reaching, overhead reaching, gross manipulation and fine manipulation with the left dominant extremities. These limitations accommodate his status post two cardiovascular accident, including weakness and difficulty walking. I also find that based on his alleged pain, fatigue, and headaches, he may not have only occasional exposure to moving mechanical parts, unprotected heights, and the operation of a motor vehicle. Further, based on his demonstrations of mental impairment but considering his cognitive shortcomings, I find that the claimant is limited to simple, routine, and repetitive tasks.

(T. 20.) This explanation, along with the discussion of the evidence, provides sufficient indication as to the bases for the limitations included in the RFC for this Court to determine that the ALJ's RFC is supported by substantial evidence. *Coleman*, 2015 WL 9685548, at *5; *Barringer*, 358 F. Supp. 2d at 78 ("Where 'the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not required to explain] why he considered articular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'") (quoting *Mongeur*, 722 F.2d at 1040).[5]

Plaintiff also relatedly argues that the ALJ erred in failing to include a more detailed function-by-function assessment of Plaintiff's exertional abilities rather than simply limiting Plaintiff to sedentary work. (Dkt. No. 11, at 22-23 [Pl. Mem. of Law].) The Second Circuit has found that the failure to provide a function-by-function analysis is not a *per se* ground for remand, noting that "[w]here an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous,

---

[5] Although the ALJ indicates that plaintiff suffered two cardiovascular accidents, as indicated <u>supra</u>, because the ALJ considered the relevant medical records and plaintiff's alleged symptoms, this error is harmless.

[] remand is not necessary merely because an explicit function-by-function analysis was not performed." *Cichocki v. Astrue*, 729 F.3d 172, 176-77 (2d Cir. 2013) (collecting cases from other circuit courts that have declined to adopt a *per se* rule). The Second Circuit noted that remand might be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Cichocki*, 729 F.3d at 177 (citing *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)).

In this case, there is no contradictory medical evidence in the record related to the relevant period that suggests Plaintiff's capabilities to stand, walk, sit, lift, carry, push, or pull were more limited than accounted for by the basic exertional definition of sedentary work.[6] Plaintiff has not pointed to any medical evidence *from the relevant period* that suggests an inability to perform the basic requirements of sedentary work and this Court did not find any such evidence in its review. Because there is no such contradictory evidence, the ALJ appears to have applied the correct legal standards and her RFC finding is supported by substantial evidence, the ALJ's failure to include a more detailed analysis does not necessitate remand. For all the above reasons, the RFC determination is supported by substantial evidence. Accordingly, remand is not warranted on this basis.

---

[6]     The regulations indicate that "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a). SSR 83-10 elaborates that occasionally is defined as "occurring from very little up to one-third of the time," and that sedentary work therefore requires an ability to stand or walk no more than two hours in an eight-hour workday and to sit approximately six hours total in an eight-hour workday. SSR 83-10, 1983 WL 31251, at *5.

**E.    Credibility Determination**

In determining whether a claimant is disabled, the ALJ must also make a

determination as to the credibility of the claimant's allegations.  "'An administrative law

judge may properly reject claims of severe, disabling pain after weighing the objective

medical evidence in the record, the claimant's demeanor, and other indicia of credibility,

but must set forth his or her reasons with sufficient specificity to enable us to decide

whether the determination is supported by substantial evidence.'"  *Schlichting v. Astrue*,

11 F. Supp. 3d 190, 205 (N.D.N.Y. 2012) (quoting *Lewis v. Apfel*, 62 F. Supp. 2d 648,

651 (N.D.N.Y. 1999)).  The Second Circuit recognizes that "'[i]t is the function of the

[Commissioner], not [reviewing courts], to resolve evidentiary conflicts and to appraise

the credibility of witnesses, including the claimant,'" and that "[i]f there is substantial

evidence in the record to support the Commissioner's findings, 'the court must uphold

the ALJ's decision to discount a claimant's subjective complaints of pain.'"  *Schlichting*,

11 F. Supp. 3d at 206 (quoting *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d

638, 642 (2d Cir. 1983); *Aponte v. Sec'y, Dep't of Health and Human Servs.*, 728 F.2d

588, 591 (2d Cir. 1984)).  Due to the fact that the ALJ has the benefit of directly

observing a claimant's demeanor and "other indicia of credibility," the ALJ's credibility

assessment is generally entitled to deference.  *Weather v. Astrue*, 32 F. Supp. 3d 363,

381 (N.D.N.Y. 2012) (citing *Tejada v. Apfel*, 167 F.3d 770, 776 (2d Cir. 1999)).

Plaintiff argues that the ALJ failed to conduct an adequate assessment of his

credibility as required by the regulations, asserting that "all the ALJ offers is the

conclusory statement without support or discussion that Plaintiff's symptoms as he

described them are 'not entirely credible' [] and 'less than fully credible.'"  (Dkt. No. 11, at 21-22 [Pl. Mem. of Law].)  However, as with Plaintiff's assertions that the ALJ failed to analyze or provide reasons for rejecting Dr. Sullivan's opinion, Plaintiff's assertions regarding the absence of a specific credibility analysis are contradicted by the decision.

The ALJ devoted multiple paragraphs to her explanation of why she found Plaintiff's allegations to be not credible.  (T. 19-20.)  She indicated that (1) she found Plaintiff's allegations regarding his physical and mental limitations were inconsistent with the medical evidence from the relevant time period, (2) there was a lack of treatment to corroborate the severity he alleged, (3) Plaintiff cancelled multiple appointments, (4) Plaintiff's mental condition was observed to improve with medication compliance, and (5) Plaintiff's reported activities of daily living were inconsistent with the extent of limitation alleged.  (*Id.*)  These statements, in conjunction with the ALJ's broader discussion of the medical treatment evidence, constitute "reasons set forth with sufficient specificity" as required by the applicable legal standards for making a credibility assessment in a Social Security disability hearing determination.  Contrary to Plaintiff's assertions, the ALJ conducted an appropriate credibility analysis, and these provided reasons are supported by substantial evidence, particularly a lack of objective evidence of severe limitations in the treatment notes from the relevant time period, Plaintiff's many cancelled appointments with Dr. Reddy, and notations of improvement of his mental symptoms when he remained compliant with his medications, all of which have been discussed in greater detail in previous sections of this Decision and Order.

Given the fact that the ALJ provided specific reasons supported by substantial evidence to support her adverse credibility finding, this Court sees no reason to depart

from the ALJ's findings, which are generally entitled to deference on appeal. *See Weather*, 32 F. Supp. 3d at 381. For all the above reasons, the credibility determination is supported by substantial evidence, and remand is not warranted on this basis.

### F.    Reliance on Vocational Expert and ALJ's Step Five Finding

Although the claimant has the general burden to prove he has a disability under the definitions of the Social Security Act, the burden shifts to the Commissioner at Step Five "'to show there is other work that [the claimant] can perform.'" *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (quoting *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d Cir. 2012)). "An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion' [] and [the hypothetical] accurately reflect[s] the limitations and capabilities of the claimant involved." *Id.* at 151 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981)). "If a hypothetical question does not include all of a claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Pardee*, 631 F. Supp. 2d at 211 (citing *Melligan v. Chater*, No. 94-CV-944S, 1996 WL 1015417, at *8 (W.D.N.Y. Nov. 14, 1996)).

Plaintiff's sole argument related to the ALJ's reliance on the vocational expert's testimony is that the hypothetical questions provided did not include the limitations that Dr. Sullivan opined. (Dkt. No. 11, at 23-24 [Pl. Mem. of Law].) However, as already

detailed, the ALJ provided good reasons for choosing to afford very little weight to Dr. Sullivan's opinion and her rejection of that opinion is supported by substantial evidence. Because the ALJ found Dr. Sullivan's opined limitations were not supported by the evidence, she was not obligated to include those limitations in the hypothetical question to the vocational expert. Accordingly, the ALJ properly relied on the vocational expert's testimony to support the Step Five determination, and remand is not warranted on this basis.

### G.     Denial of Plaintiff's Request to Re-Open Prior Applications

"Where a claimant seeks to reopen a claim where a final decision has been rendered, the Commissioner may refuse such as request under the doctrine of *res judicata*." *Saxon*, 781 F. Supp. 2d at 99 (citing *Dunn v. Astrue*, No. 08-CV-0704, 2010 WL 376390, at *3 (W.D.N.Y. Jan. 27, 2010)). "The Commissioner's decision not to reopen a prior determination is not a final decision for the purposes of § 405(g), and thus federal courts lack jurisdiction to review the administrative decision not to reopen a previous claim for benefits." *Id.* (citing *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003)). "There are two circumstances in which the federal courts may review the Commissioner's decision not to reopen a disability application: (1) where the Commissioner has constructively reopened the case; and (2) "where the claimant has been denied due process." *Id.* (quoting *Byam*, 336 F.3d at 179). Although an ALJ can be deemed to have constructively reopened an application where he reviews the entire record and renders a decision on the merits, "[a] matter is not constructively reopened when the ALJ merely discusses prior proceedings and evidence to describe a claimant's

background." *Id.* (citing *Grant v. Shalala*, No. 93-CV-0124, 1995 WL 322589, at *7 (W.D.N.Y. Mar. 13, 1995)).

Plaintiff does not allege that the ALJ constructively reopened his prior applications. However, it is worth noting that the ALJ indeed did not provide any indication that she constructively reopened Plaintiff's previous application. First, the ALJ in this case did not obtain the file that was submitted for that prior application, and Plaintiff acknowledges that his prior application file had been destroyed, and, therefore, could not have been obtained. *See Saxon*, 781 F. Supp. 2d at 99 (finding that the ALJ could not have constructively reopened the plaintiff's prior decision because the ALJ did not obtain the prior file) (citing *Owens v. Apfel*, No. 98-CV-4379, 2004 WL 2725083, at *3 (S.D.N.Y. Nov. 24, 2004)). Second, the ALJ explicitly indicates in the written decision that she found Plaintiff "was not under a disability within the meaning of the Social Security Act from March 21, 2000, through the date last insured." (T. 12, 23.) Since Plaintiff reported that his previous applications were denied on March 20, 2000, the ALJ's decision indicates that she did not intend her findings to apply for any time period covered by the previous applications. (Dkt. No. 11, at 24 [Pl. Mem. of Law].) Therefore, this Court does not have the ability to review the ALJ's decision not reopen Plaintiff's prior applications on the first exception to the lack of jurisdiction.

The appropriate question then is whether the ALJ's actions denied Plaintiff due process. Plaintiff argues that the ALJ's lack of explanation for the implicit denial of his request for reopening violated his rights because the evidence shows that he had an impairment that prevented him from being able to pursue his appeal of those prior decisions within the appropriate time period. (Dkt. No. 11, at 24-25 [Pl. Mem. of Law].)

34

In support of this argument, Plaintiff cites *Hope v. Astrue*, No. 08-CV-0978, 2010 WL 3118581 (N.D.N.Y. Apr. 15, 2010) for the proposition that remand is required when there is "insufficient consideration by the ALJ of Plaintiff's request to reopen." (Dkt. No. 11, at 25 [Pl. Mem. of Law].) In *Hope*, this Court found that the plaintiff had raised a colorable constitutional due process claim by showing that she was mentally incapacitated during the time period in which to appeal to the prior application decision, a finding that was sufficient to confer jurisdiction to review the denial of reopening. *See Hope*, 2010 WL 3118581, at *2. Plaintiff essentially argues that his impairments prevented him from being mentally competent and rendered him unable to appeal the previous unfavorable decisions and, thus, he has raised a colorable due process claim.[7] (Dkt. No. 11, at 24-25 [Pl. Mem. of Law].) However, as will be discussed below, the mere existence of some mental limitation is not sufficient to show mentally incapacity or to raise a colorable due process violation.

"An individual 'suffering from mental illness raises a colorable constitutional claim when he asserts that his mental illness precluded him from litigating his claim because it

---

[7]     Notable differences exist between *Hope* and Plaintiff's claim. Most importantly, *Hope* involved unique factual circumstances, namely that the ALJ in the decision on appeal had found the plaintiff disabled all the way back to April 11, 1980, the onset date that the plaintiff had alleged in her prior application (and thereby implicating the period covered by the prior application). In Plaintiff's claim, the ALJ did not find him disabled at any point and expressly considered only the period following the final Agency decision on the prior applications. *Cf. Hope*, 2010 WL 3118581, at *1-2; *see* T. 12, 23. Additionally, in *Hope*, the Court noted that the medical evidence substantiated the presence of the plaintiff's mental impairment from the time of her prior application, including objective observations on examinations and documentation of "specific mental disorders and cognitive, social, and emotional impairments." *See Hope*, 2010 WL 3118581, at *2. By contrast, in Plaintiff's case, it is not entirely clear when he filed is prior application, but the evidence from the time his CVAs occurred in 1998 and evidence from early 2000 does not contain much indication of cognitive or mental deficits to substantiate Plaintiff's allegations that he had a sufficiently particularized mental impairment during the period covered by the prior application. *See, e.g.*, T. 520-23, 526-584. Due to these differences, *Hope* is not dispositive here and does not require a different finding.

prevented him from proceeding from one administrative level to another." *Hope*, 2010 WL 3118581, at *3 (quoting *Byam*, 336 F.3d at 182) (citations and quotations omitted).

> However, in order to invoke jurisdiction, based on a due process claim of mental incapacity, a plaintiff must show "a particularized allegation of mental impairment plausibly of sufficient severity to impair comprehension.  A claim of constitutionally defective notice , . . . cannot invoke federal court jurisdiction merely upon a generalized allegation, ... that the claimant was too confused to understand available administrative remedies."

*Id.* (quoting *Stieberger v. Apfel*, 134 F.3d 37, 40-41 (2d Cir. 1997)); *see also Byam*, 336 F.3d at 182 (noting that "*Steinberger* made clear [] that a claimant's argument that she was so impaired as to be unable to pursue administrative remedies requires more than a 'generalized allegation' of confusion; it requires a 'a particularized allegation of mental impairment plausibly of sufficient severity to impair comprehension'"").  A claimant's allegations of his mental impairment are not sufficient to establish a colorable constitutional claim; rather, the claimant "must furnish evidence establishing a mental impairment for the time period surrounding the applications they wish to reopen."  *Hope*, 2010 WL 3118581, at *3 (citing *Byam*, 336 F.3d at 183).

Although SSR 91-5p is generally applicable in a situation where a court has the jurisdiction to review a denial of reopening, it provides guidance applicable to this situation.  It provides that, in cases where a claimant's mental incapacity prevented him from timely requesting review of an adverse determination for benefits, this mental incapacity can provide good cause for allowing the claimant to request an extension of time to appeal that determination (or, more relevant to this case, to reopen the previous application) regardless of how much time has passed since the previous determination. *See* SSR 91-5p, 1991 WL 208067, at *1-2 (SSA July 1, 1991).  SSR 91-5p states:

36

> When a claimant presents evidence that mental capacity prevented him or her from timely requesting review of an adverse determination, decision, or dismissal, or review by a Federal district court, and the claimant had no one legally responsible for prosecuting the claim [] at the time of the prior administrative action, SSA will determine whether or not good cause exists for extending the time to request review.  If the claimant satisfies the substantive criteria, the time limits in the reopening regulations do not apply; so that, regardless of how much time has passed since the prior administrative action, the claimant can establish good cause for extending the deadline to request review of that action.
>
> *The claimant will have established mental incapacity for the purpose of establishing good cause when the evidence establishes that he or she lacked the mental capacity to understand the procedures for requesting review.*
>
> In determining whether a claimant lacked the mental capacity to understand the procedures for requesting review, the adjudicator must consider the following factors as they existed at the time of the prior administrative action: [(1)] inability to read or write; [(2)] lack of facility with the English language; [(3)] limited education; [(4)] any mental or physical condition which limits the claimant's ability to do things for him/herself

*Id.* at *2 (emphasis added).  The main standard of medical incapacity in SSR 91-5p is similar to the standard expressed in *Hope* regarding when a claimant has shown a colorable constitutional due process claim, as both require that there be a mental impairment that prevents the claimant from being able to navigate the appeals process due a lack of comprehension of that process.  Considering *Hope* and the relevant guidance from SSR 91-5p together, in order to raise a colorable due process violation based on his mental functioning, Plaintiff was required to show that he suffered from a mental or other impairment that plausibly rendered him unable to understand and follow through with the appeals process due to impaired comprehension around the relevant time period for appeal.  *See id.*; *Hope*, 2010 WL 3118581, at *3.

Plaintiff, however, has not made such a showing.[8]  Plaintiff lists a host of allegations of mental deficits including speech impairment, difficulty with words and understanding, loss of ability to read, write and spell, poor memory, poor concentration, and poor judgment; however, as noted above, Plaintiff's allegations themselves are not sufficient to raise a constitutional due process claim without evidence to establish the presence of a mental impairment during the applicable time period.  (Dkt. No. 11, at 24 [Pl. Mem. of Law]); *see Hope*, 2010 WL 3118581, at *3 (citing *Byam*, 336 F.3d at 183). The medical evidence from the time period surrounding the decision on his previous application does not substantiate Plaintiff's allegations of mental symptoms that would have prevented him from understanding the procedures for requesting review of that decision.  On January 28, 2000, Plaintiff's mood and affect were noted to be appropriate and no other objective observations were made regarding his mental or intellectual functioning.  (T. 522-23.)  Plaintiff cancelled a scheduled psychiatric evaluation on March 7, 2000.  (*Id.* at 518.)  On April 7, 2000, he reported a host of symptoms related to depression as well as inability to read and write since his stroke and poor concentration and focus, but on examination Dr. Reddy observed that he related well with good eye contact, had no psychomotor abnormality, reported a depressed mood with a full and appropriate affect, was not delusional, had a coherent and goal-directed thought process, had intact memory and recall, was able to perform serial sevens testing, and was able to remember and list the presidents from Clinton

---

[8]     As noted, Plaintiff reported that the final Agency decision on his prior application was rendered on March 20, 2000.  (Dkt. No. 11, at 24 [Pl. Mem. of Law].)  Therefore, his deadline to appeal that decision to the Appeals Council would have been May 19, 2000.  *See* 20 C.F.R. § 404.968(a)(1) (indicating that a request for appeals of an ALJ's decision to the Appeals Council should me made "[w]ithin 60 days after the date you receive the notice of the hearing decision or dismissal").  This is the time period that must be assessed for evidence of mental incapacity.

back to Nixon accurately.  (T. 516.)  Plaintiff then cancelled two subsequent

appointments with Dr. Reddy on March 8, 2000, and March 19, 2000.  (*Id.* at 513-14.)

The medical evidence during the time of Plaintiff's 60-day window to appeal the

unfavorable decision on his previous application simply does not substantiate the

severely limiting mental and cognitive symptoms Plaintiff alleged were affecting him.

Notably, Dr. Reddy's April 2000 examination was squarely within the appeal period and

showed intact memory and recall, ability to perform serial sevens, and the ability to

recall a number of recent presidents correctly.  These findings do not suggest an

individual who plausibly had a mental impairment that would render him unable to

comprehend the procedures for requesting review of that prior unfavorable decision or

otherwise unable to proceed due to incapacitation.

Additionally, the evidence from 1998 and early 2000 does not indicate a specific

diagnosis that shows cognitive or mental impairment.  Notably, on January 28, 2000,

NP Trevisani notes in her assessment section that Plaintiff complained of a number of

symptoms related to his CVAs, but these did not include any particular indication of

cognitive or mental disorders or effects.  (T. 523.)  The only mental-related notation is

that NP Trevisani indicated that she was sending him for a psychological consult to

"[rule out] depression."[9]  (*Id.*)  Dr. Reddy did diagnose dysthymic disorder on April 7,

2000, but, as already discussed, his observations on the examination were mostly

unremarkable and showed fairly intact cognitive functioning.  (*Id.* at 516.)  The

evidence, therefore, does substantiate "'a particularized allegation of mental

---

[9]       As already discussed multiple times throughout this Decision and Order, the record from March 2000 onward is replete with cancellations of appointments with Dr. Reddy, something which, as the ALJ noted in the decision, raises questions as to the level of severity of Plaintiff's depression symptoms.  (T. 20, 505, 507-08, 513-14, 518.)

impairment plausibly of sufficient severity to impair comprehension'" during the time period related to Plaintiff's prior application and during the regulatory time period he had to appeal. *Hope*, 2010 WL 3118581, at *3 (quoting *Stieberger* 134 F.3d at 40-41).

The medical evidence from the relevant time period does not substantiate Plaintiff's allegations that his impairments incapacitated him to the extent that he would plausibly have been unable to comprehend the procedures for requesting review, or that they otherwise prevented him from proceeding from one administrative level to another as a result of deficient mental or cognitive functioning. Thus, Plaintiff has not shown a colorable constitutional due process claim stemming from a mental impairment during the time period relevant to appealing his prior unfavorable decisions. Absent the presence of a potential due process violation, this Court lacks the jurisdiction to review the ALJ's implicit denial of Plaintiff's request to reopen his prior applications under the second applicable exception. Accordingly, the ALJ's implicit denial of Plaintiff's request to reopen his application was not a denial of his due process rights, and this Court therefore does not have the jurisdiction to review the Commissioner's decision to decline to reopen Plaintiff's earlier applications.

## IV. CONCLUSION

**WHEREFORE**, for the reasons stated herein, it is

**ORDERED**, that Plaintiff's motion for judgment on the pleadings (Dkt. No. 11) is **DENIED**; and it is further

**ORDERED**, that Defendant's motion for judgment on the pleadings (Dkt. No. 12) is **GRANTED**; and it is further

**ORDERED**, that Defendant's decision denying Plaintiff disability benefits is

**AFFIRMED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**IT IS SO ORDERED.**

Dated: July 26, 2017
Albany, New York

Christian F. Hummel
U.S. Magistrate Judge